M. Anderson Berry (SBN 262879)
Gregory Haroutunian (SBN 330263)
**EMERY | REDDY, PC**
333 University Avenue, Suite 200
Sacramento, CA 95825
916.823.6955 (Tel)
206.441.9711 (Fax)
*anderson@emeryreddy.com*
*gregory@emeryreddy.com*

*[Additional Counsel Listed in Signature Block]*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WANDA GAITHER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>ASTRANA HEALTH MANAGEMENT, INC.<br>-and-<br><br>ASTRANA HEALTH, INC.<br><br>Defendants. | Case No. ___________________<br><br>**CLASS ACTION COMPLAINT**<br><br>(1) NEGLIGENCE & NEGLIGENCE *PER SE*;<br>(2) BREACH OF IMPLIED CONTRACT;<br>(3) UNJUST ENRICHMENT;<br>(4) INVASION OF PRIVACY;<br>(5) VIOLATION OF THE UCL, Cal. Bus. & Prof. Code § 17200, et seq.; AND<br>(6) VIOLATIONS OF CMIA, Cal. Civ. Code §§ 56, et seq.<br><br>**DEMAND FOR JURY TRIAL** |

**CLASS ACTION COMPLAINT**

Plaintiff, Wanda Gaither, individually and on behalf of all others similarly situated, brings this class action against Defendants Astrana Health Management, Inc. and Astrana Health, Inc. (together, "Astrana" or "Defendants") and alleges, upon personal knowledge

as to her own actions and her counsel's investigations, and upon information and belief as to all other matters, as follows:

## INTRODUCTION

1. Plaintiff brings this class action against Defendants for their failures to properly secure and safeguard the personal information, including Protected Health Information ("PHI")[1] and Personally Identifiable Information ("PII")[2] (together, "Private Information") of Plaintiff and other similarly situated patients of Defendants' patients ("Class Members").

2. Defendants Astrana are, together, a California-based healthcare provider which purports to have a mission of being:

> … forward-thinking team of physician-led innovators with a strong foundation of physician empowerment, committed to enhancing physician work satisfaction and repairing the healthcare system. Our core mission revolves around understanding local healthcare dynamics and passionately serving diverse and underserved populations. We empower entrepreneurial providers to offer the highest quality care to patients through value-based care arrangements and our comprehensive technology and solutions platform.[3]

3. To provide those services, Astrana collects and maintains its patients' Private

---

[1] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). Defendants are each clearly a "covered entity" and some of the data compromised in the breach that this action arises out of is "protected health information," subject to HIPAA.

[2] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[3] Astrana Health, *Overview*, https://www.astranahealth.com/overview/ (last acc. Oct. 11, 2026).

Information, and requires patients to provide their most intimate PII and PHI as a condition of receiving medical services, which Defendants stores in its information security systems.

4. Upon information and belief, on or about September 22, 2026, cybercriminals accessed Astrana's systems and exfiltrated data, including "certain private and/or confidential information maintained on the Company's servers […which was…] accessed and/or acquired without authorization.[4] ("the Data Breach").

5. Upon information and belief, Astrana failed to adequately protect its patients' Private Information, allowing cybercriminals to access, exfiltrate, and steal the information in the Data Breach.

6. As of the filing of this Complaint, Defendants have not publicly acknowledged the Data Breach or notified the individuals whose Private Information was compromised. Those individuals therefore have received no warning to take protective measures.

7. Astrana's failures to implement reasonable data security measures caused the Data Breach. As a result, Plaintiff and Class Members face a present and continuing risk of identity theft, medical identity theft, and fraud. They have also suffered the loss of privacy in their Private Information, the diminished value of that information, and lost time spent mitigating the effects of the Data Breach.

---

[4] U.S. Securities and Exchange Commission (SEC), Astrana Health, Inc, Form 8-K, Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, https://www.sec.gov/ix?doc=/Archives/edgar/data/1083446/000110465926109813/asth-20260922x8k.htm#fact-identifier-23 (last acc. Oct. 11, 2026).

8. Accordingly, Plaintiff, on behalf of herself and all others similarly situated, brings this action seeking damages, restitution, injunctive relief, and reasonable attorneys' fees and costs.

## PARTIES

9. Plaintiff, Wanda Gaither, is a natural person and citizen of the State of Nevada, where she intends to remain, with a principal residence in Las Vegas, Clark County, Nevada.

10. Defendant, Astrana Health Management, Inc. ("Astrana Health Management") is a corporation organized and existing under the laws of the State of California with its principal place of business at 1668 S. Garfield Avenue, 2nd Floor, Alhambra, California 91801, and a subsidiary of Defendant, Astrana Health, Inc.

11. Defendant, Astrana Health, Inc. ("Astrana Health") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1668 S. Garfield Avenue, 2nd Floor, Alhambra, California 91801.

12. Defendants Astrana Health Management, Inc. and Astrana Health, Inc. operate together to provide health care services, across the country, and share the same principal place of business, at 1668 S. Garfield Avenue, 2nd Floor, Alhambra, California 91801.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5

million, exclusive of interest and costs. There are over one-hundred (100) putative Class Members.

14. This Court has personal jurisdiction over Defendants because they are headquartered in California, and regularly conduct business in California. Defendants and Plaintiff are citizens of different states.

15. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants' principal offices are in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

***Astrana's Business and Collection of Private Information***

16. Astrana is California-based healthcare provider which provides medical and associated services across the nation in California, Nevada, New Mexico, Arizona, Texas, Alabama, Georgia, Florida, Virginia, Maryland, and Connecticut.[5]

17. Astrana operates through a "Care Model," which purports to provide medical care "[f]rom primary to multi-specialty care, […to…] help you access it all":

[5] https://www.astranahealth.com/ (last acc. Oct. 11, 2026).




18. Specifically, Defendants provide:

| | |
|---|---|
| Primary Care | We prioritize delivering comprehensive primary care services to manage overall well-being and common medical conditions. |
| Preventative Care | We take a proactive approach, emphasizing preventative care measures to detect and address health issues early on for optimal patient well-being. |
| Integration with Specialist Care | We excel in integrating primary care with specialized services to provide patients with a well-coordinated and comprehensive healthcare experience. |
| Culturally Aligned Care Team | Our culturally diverse care team collaborates effectively, embracing cultural considerations to ensure personalized and inclusive patient care. |
| Access to Supercenters | We ensure convenience with accessible healthcare supercenters, offering a wide array of services under one roof to meet the diverse needs of our patients. |
| Access to AstranaCare Clinics | Our localized clinics bring specialized medical attention closer to communities, providing convenient access to high-quality healthcare services for all. |

6

[6] https://www.astranahealth.com/care-model/ (last acc. Oct. 11, 2026).

19. Astrana works with many healthcare partners. As Defendants state:

> Join the Astrana family as an Astrana Care Partner, with one of our many high-quality, risk-bearing networks or IPA's across California, Nevada, or Texas. You'll be empowered to rediscover the joy of independent practice and be empowered to do what you love – making a difference in your patients' lives. Astrana Care Partners providers are highly passionate, provide high-value, evidence-driven care, and multiply their impact via the Astrana technology platform, with more time for patients and less time spent on administrative burdens.
>
> Over 65% of prior authorizations across our Astrana Care Partner networks are auto-approved, and we build dashboards, software, and analytics to put control back where it should be – with you.[7]

20. As a condition of providing its services, Defendants receive, store, and process the Private Information of patients and patients of its healthcare provider partners, as well as other individuals whose information those clients maintain.

21. On information and belief, Astrana Health promises to protect the Private Information, including PHI, of its patients and its healthcare partners' patients.

22. Astrana therefore knew that it maintained highly sensitive patient information and that it had a duty to protect that information.

23. Despite this knowledge, upon information and belief, Astrana failed to implement reasonable cybersecurity safeguards, policies, and monitoring sufficient to prevent, detect, and stop the Data Breach.

***The Data Breach***

24. Upon information and belief, on or about September 22, 2026,

---

[7] https://www.astranahealth.com/join-astrana-health/ (last acc. Oct. 11, 2026).

cybercriminals accessed Defendants' systems and exfiltrated data, including "certain private and/or confidential information maintained on the Company's servers […which was…] accessed and/or acquired without authorization.[8] ("the Data Breach").

25. Indeed, as Astrana Health reported in its 8-K filing with the U.S. Securities and Exchange Commission ("SEC") on September 23, 2026:

> Astrana Health, Inc. (the "Company") recently became aware that its subsidiary Astrana Health Management, Inc. detected unusual activity within its environment.
>
> The incident involved a series of social engineering attempts in which threat actors, impersonating Company personnel and spoofing the Company's main corporate telephone number, contacted certain employees in an effort to obtain unauthorized access to Company systems. The Company's cybersecurity team detected and responded to the unauthorized activity, launched an investigation, engaged a leading third-party cybersecurity and digital forensics firm, notified law enforcement, and is notifying state and federal regulators, and payer partners. The Company has also taken remedial measures, including resetting affected credentials, restricting remote access tools, restoring certain systems from clean backups, and enhancing monitoring, logging, and detection capabilities across its environment. The Company's investigation into the nature and scope of the incident, including the matters described above, remains ongoing.[9]

26. As Defendants' filing with the SEC went on to say:

> Based on the current status of the Company's ongoing investigation, the Company believes that certain private and/or confidential information maintained on the Company's servers has been accessed and/or acquired without authorization.

---

[8] U.S. Securities and Exchange Commission (SEC), Astrana Health, Inc, Form 8-K, Current Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, https://www.sec.gov/ix?doc=/Archives/edgar/data/1083446/000110465926109813/asth-20260922x8k.htm#fact-identifier-23 (last acc. Oct. 11, 2026).

[9] *Id.*

> The Company continues to assess whether, and to what extent, patient, employee, credentialed provider, confidential business and financial information, intellectual property, or other information may have been accessed, acquired, or exfiltrated and continues to evaluate the potential impact of the unauthorized activity. The Company continues to evaluate applicable regulatory and legal notification requirements, and the Company intends to make all required notifications based on its findings, including to impacted patients.[10]

27. Although the precise nature of the Private Information compromised in the Data Breach is not yet known, Defendants have admitted, "…that the incident is material as of September 22, 2026, due to the potential confidential and sensitive nature of the data that is involved…"[11]

28. On information and belief, Defendants' Data Breach resulted in the compromise and exfiltration of Plaintiff's and the Class Members' Private Information, including PHI.

29. Although almost three weeks have passed since Defendants reported the Data Breach to the SEC, Astrana has not publicly confirmed the Data Breach, notified affected individuals, or, upon information and belief, reported the Data Breach to state or federal regulators, including the U.S. Department for Health and Human Services, Office for Civil Rights. Plaintiff has not received notice from Astrana.

**Defendants' Data Breach Was Imminently Foreseeable**

30. Defendants' data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting institutions that collect

---

[10] *Id.*

[11] *Id.*

and store Private Information, like Defendants, preceding the date of the Data Breach.

31. Data thieves regularly target institutions like Defendants due to the highly sensitive information in their custody. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

32. In 2025 alone, 3,322 data compromises occurred, which was an all-time high. 2,928 of those were data breaches, with 2,656 related specifically to cyberattacks.[12]

33. As a custodian of Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members because of a breach.

34. Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

35. Defendants was, or should have been, fully aware of the unique type and the significant volume of data in its systems and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

36. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

37. The ramifications of Defendants' failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[12] 2025 Data Breach Report, at page 6 https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (lasts accessed March 3, 2026).

**Value of Personally Identifiable Information**

38. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[13] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[14]

39. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[15]

40. The information compromised in the Data Breach is even more significant because it includes health and medical information, which is extraordinarily sensitive and private and is commonly used to perpetrate medical and insurance fraud.

41. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[16]

42. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S.

---

[13] 17 C.F.R. § 248.201 (2013).

[14] *Id.*

[15] Anita George, *Your Personal Data Is for Sale on The Dark Web. Here's How Much It Costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

[16] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[17]

**Defendants Failed to Comply with FTC Guidelines**

43. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTC Act, 15 U.S.C. § 45. *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

44. In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

[17] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

45. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

46. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

47. As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices, or to appropriately prepare to face a data breach and respond to it in a timely manner. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

48. Defendants was at all times fully aware of their obligation to protect the PII of individuals like Plaintiff and Class Members under the FTC Act, yet failed to comply with such obligations. Defendants was also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**Defendants Failed to Comply with HIPAA**

49. Upon information and belief, Defendants are covered entities and/or business associates under HIPAA, 45 C.F.R. § 160.103, because it creates, receives, maintains, or transmits protected health information on behalf of covered entities. As such, Defendants are directly subject to the HIPAA Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C, and to the applicable provisions of the Privacy and Breach Notification Rules. *See* 45 C.F.R. §§ 164.302, 164.410, 164.502(e); 42 U.S.C. § 17931.

50. Defendants are subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

51. HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

52. HIPAA's Security Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

53. HIPAA requires "comply[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

54. "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

55. HIPAA's Security Rule requires Defendants to do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the

security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

56. HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants is required under HIPAA to "[i]implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

57. The HIPAA Breach Notification Rule requires a business associate, following discovery of a breach of unsecured protected health information, to notify the covered entity without unreasonable delay and in no case later than 60 calendar days after discovery, and to identify each individual whose information was involved. 45 C.F.R. § 164.410. The covered entity then must notify affected individuals. 45 C.F.R. § 164.404. Defendants' failure to timely identify and report the Data Breach therefore delays notice to every affected individual.

58. HIPAA further requires that a business associate's contract with a covered entity obligate the business associate to use appropriate safeguards to prevent unauthorized use or disclosure of protected health information and to report any such use or disclosure to the covered entity. 45 C.F.R. § 164.504(e)(2)(ii).

59. HIPAA also requires the Office for Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents

on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302–164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material. The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.

60. Defendants was at all times fully aware of their HIPAA obligations to protect the PHI of individuals like Plaintiff and Class Members, yet failed to comply with such obligations. Defendants was also aware of the significant repercussions that would result from their failure to do so. Accordingly, Defendants' conduct was particularly unreasonable given the nature and amount of PHI it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**Defendants Failed to Comply with Industry Standards.**

61. Experts studying cybersecurity routinely identify institutions that store Private Information like Defendants as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

62. Some industry best practices that should be implemented by institutions dealing with sensitive Private Information, like Defendants, include, but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, implementing reasonable systems to identify malicious activity, implementing reasonable governing policies, and limiting which employees can access

sensitive data. As evidenced by the Data Breach and its timeline, Defendants failed to follow some or all these industry best practices.

63. Other best cybersecurity practices that are standard at large institutions that store Private Information include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points.

64. Defendants failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

65. Defendants failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**Common Injuries & Damages**

66. Because of Defendants' ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; and (c) the continued risk to their Private Information, which remains in the possession of Defendants, and which is subject to further breaches, so long as Defendants fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' Private Information.

**The Data Breach Increases Victims' Risk of Identity Theft and Fraud**

67. Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendants' failures resulted in Plaintiff's and Class Members' Private Information falling into the hands of identity thieves.

68. The unencrypted Private Information of Class Members has already or will end up for sale on the dark web because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the Private Information for the express purpose of conducting financial fraud and identity theft operations.

69. Further, the standard operating procedure for cybercriminals is to use some data, like the PHI here, to access "fullz packages" of that person to gain access to the full suite of additional PHI that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.[18]

70. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

---

[18] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

71. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

**Loss of Time to Mitigate Risk of Identity Theft and Fraud**

72. Because of the recognized risk of identity theft, when a data breach occurs and an individual's Private Information is compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and to a defendant arguing that the individual failed to mitigate damages.

73. The need to spend time mitigating the risk of harm is especially important in cases like this where Plaintiff's and Class Members' Private Information is affected because such information is commonly used to commit medical and insurance fraud.

74. By spending this time, Plaintiff is not manufacturing her own harm but is taking necessary steps because the Data Breach included her Private Information.

75. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their

accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts and health insurance statements for any indication of fraudulent activity, which may take years to detect.

76. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[19]

77. These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[20]

**The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary**

78. Based on the value of the information stolen, the data either has or will be sold to cybercriminals whose mission it is to perpetrate identity theft and fraud. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

---

[19] *See* U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[20] *See* Fed. Trade Comm'n, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.

79. Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

80. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

**Plaintiff's Experience**

81. Plaintiff is a current patient of Defendants from July 2026 to the present, and Astrana obtained Plaintiff's Private Information in the course of its regular business operations.

82. Upon information and belief, at the time of the Data Breach, Defendants maintained Plaintiff's Private Information in its system, and of which Defendant had access to.

83. In order to obtain services from Defendants, Plaintiff was required to provide her Private Information to Defendants, including among other things, her name, contact information, date of birth, Social Security Number, and driver's license number.

84. Plaintiff is very careful about sharing her sensitive Private Information, including PHI. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII/PHI over the internet or any other unsecured source. Plaintiff would not have entrusted her Private Information to Defendants had she known of Defendants' lax data security policies.

85. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach. Plaintiff has spent significant time dealing with the Data Breach roughly

twenty (20) hours of her valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

86. As a result of the Data Breach, Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff monitors her Private Information multiple times a week and has already spent many hours dealing with the Data Breach, valuable time Plaintiff otherwise would have spent on other activities.

87. Plaintiff suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) misuse of Private Information; (ii) spam calls and communications; (iii) invasion of privacy; (iv) theft of her Private Information; (v) lost or diminished value of Private Information; (vi) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) loss of benefit of the bargain; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information.

88. Plaintiff suffered actual injury from the dramatic increase in spam, suggesting that her Private Information entrusted to Defendants has been stolen in the Data Breach and is now in the hands of cybercriminals.

89. Furthermore, the Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed her of key details about the Data Breach's occurrence.

90. As a result of the Data Breach ns, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

91. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

92. Plaintiff has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendants' possession, is protected and safeguarded from future breaches.

93. Plaintiff greatly values her privacy, and would not have provided her Private Information, undertaken the services and paid the amounts that she did had she known that her Private Information would be maintained using inadequate data security systems.

## CLASS ALLEGATIONS

94. Plaintiff brings this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) on behalf of herself and on behalf of all members of the proposed class defined as:

**All individuals in the United States whose Private Information was compromised in the Data Breach (the "Class").**

95. Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

96. Plaintiff reserves the right to amend the definition of the proposed Class or to add a subclass before the Court determines whether certification is appropriate.

97. <u>Numerosity.</u> The Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, Plaintiff believes the proposed Class includes thousands of individuals who have been damaged by Defendants' conduct as

alleged herein. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendants' records.

98. Commonality. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

- Whether Defendants engaged in the conduct alleged herein;
- Whether Defendants' conduct violated the FTC Act and HIPAA;
- When Defendants learned of the Data Breach;
- Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;
- Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;
- Whether Defendants' data security systems, prior to and during the Data Breach, were consistent with industry standards;
- Whether Defendants owed duties to Class Members to safeguard their Private Information;
- Whether Defendants breached its duties to Class Members to safeguard their Private Information;
- Whether hackers obtained Class Members' Private Information via the Data Breach;
- Whether Defendants knew or should have known its data security systems and monitoring processes were deficient;
- What damages Plaintiff and Class Members suffered as a result of Defendants' misconduct;
- Whether Defendants' conduct was negligent;
- Whether Plaintiff and Class Members are entitled to damages;
- Whether Plaintiff and Class Members are entitled to additional credit or

identity monitoring and monetary relief; and among other things,

- Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

99. Typicality. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach. Plaintiff's claims are typical of those of the other Class Members because, *inter alia*, all Class Members were injured through the common misconduct of Defendants. Plaintiff is advancing the same claims and legal theories on behalf of herself and all other Class Members, and there are no defenses that are unique to Plaintiff. The claims of Plaintiff and those of Class Members arise from the same operative facts and are based on the same legal theories.

100. Adequacy of Representation. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

101. Predominance. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members. For example, all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

102. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The

prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

103. Under Federal Rule of Civil Procedure 23(b)(2), class certification is also appropriate. Defendants have acted and/or refused to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

104. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names and addresses and/or email addresses of Class Members affected by the Data Breach.

## CLAIMS FOR RELIEF

## COUNT I
## NEGLIGENCE AND NEGLIGENCE *PER SE*
**(On Behalf of Plaintiff and the Class)**

105. Plaintiff incorporates the above allegations as if fully set forth herein.

106. Plaintiff and the Class Members provided their non-public Private Information to Defendants, their healthcare providers, as a condition of receiving medical care.

107. Defendants had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiff and the Class Members could and would suffer if the Private Information were wrongfully disclosed.

108. By assuming the responsibility to collect and store this data, Defendants had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

109. Defendants had duties to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting

commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

110. Defendants' duties to use reasonable security measures also arose under the common law, and as informed by the FTC Act and HIPAA, which mandates that Defendants implement reasonable cybersecurity measures.

111. Defendants owed a duty of care to Plaintiff and the Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

112. Moreover, Defendants had a duty to promptly and adequately report the Data Breach so that Plaintiff and Class Members could be timely notified.

113. Defendants had and continues to have duties to adequately disclose that the Private Information of Plaintiff and Class Members within Defendants' possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

114. Defendants breached their duties, pursuant to the FTC Act, HIPAA, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

- Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;
- Allowing unauthorized access to Class Members' Private Information;
- Failing to remove Plaintiff's and Class Members' Private Information it was no longer required to retain pursuant to regulations; and
- Failing to implement a reasonable cybersecurity incident response plan that

would have enabled Defendants to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so they could take appropriate steps to mitigate the potential for identity theft and other damages.

115. Defendants' conduct was particularly unreasonable given the nature and amount of Private Information, including PHI, they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

116. Defendants' violation of the FTC Act and HIPAA also constitutes negligence *per se*, as those provisions are designed to protect individuals like Plaintiff and the proposed Class Members from the harms associated with data breaches.

117. But for Defendants' wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the Private Information of Plaintiff and Class Members would not have been compromised.

118. There is a close causal connection between Defendants' failure to implement security measures to protect the Private Information of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The Private Information of Plaintiff and Class Members was lost and accessed as the proximate result of Defendants' failure to exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

119. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) nominal damages; and (v) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject

to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information.

120. As a direct and proximate result of Defendants' negligence and negligence *per se*, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

121. Additionally, as a direct and proximate result of Defendants' negligence and negligence per se, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

122. Plaintiff and Class Members are therefore entitled to damages, declaratory and injunctive relief, and attorneys' fees, costs, and expenses.

123. Given Defendants' failures to implement the proper systems, as defined above, even knowing the ubiquity of the threat of data breaches, Defendants' decision not to invest enough resources in its cyber defenses amounts to negligence.

## COUNT II
## BREACH OF IMPLIED CONTRACT
## (On Behalf of Plaintiff and the Class)

124. Plaintiff incorporates the above allegations as if fully set forth herein.

125. Plaintiff's and Class Members' Private Information was provided to Defendants, through their healthcare providers, so that Defendants could perform revenue cycle and billing services for those providers.

126. By accepting and using Plaintiff's and Class Members' Private Information to provide those services, Defendants implicitly agreed to safeguard that information using reasonable measures and to timely report any breach.

127. Defendants knew that Plaintiff and Class Members entrusted their Private Information to their healthcare providers, and through them to Defendants, on the mutual understanding that it would be kept confidential and secure.

128. Defendants, however, failed to secure Plaintiff's and Class Members' Private Information and, therefore, breached its implied agreement to protect it.

129. If Plaintiff and Class Members had known that Defendants had not reasonably secured their Private Information, they would not have permitted it to be shared with Defendants.

130. As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) nominal damages; and (v) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information.

## COUNT III
## UNJUST ENRICHMENT
## (On Behalf of Plaintiff and the Class)

131. Plaintiff incorporates the above allegations as if fully set forth herein.

132. This claim is pleaded in the alternative to the breach of implied contractual duty claim.

133. Plaintiff and Class Members conferred a benefit on Defendants. Defendants' business depends on processing their Private Information, and, upon information and belief, Defendants is also paid by its healthcare provider partners from revenue generated by Plaintiff's and Class Members' payments.

134. Defendants appreciated or had knowledge of the benefits conferred upon them by Plaintiff and Class Members.

135. Defendants enriched themselves by saving the costs they reasonably should have spent on data security measures to protect Plaintiff's and Class Members' Private Information.

136. Under principles of equity and good conscience, Defendants should not be permitted to retain the full value of the benefits it derived from Plaintiff's and Class Members' Private Information, because Defendants failed to adequately protect it. Plaintiff and Class Members would not have permitted their Private Information to be shared with Defendants had they known it would not be adequately protected.

137. Defendants should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by it because of its misconduct and the Data Breach alleged herein.

## COUNT IV
## INVASION OF PRIVACY
## (On Behalf of Plaintiff and the Class)

138. Plaintiff incorporates the above allegations as if fully set forth herein.

139. Plaintiff and Class Members took reasonable and appropriate steps to keep their Private Information confidential from the public.

140. Plaintiff's and Class Members' efforts to safeguard their own Private Information were successful, as their Private Information was not known to the public prior to the Data Breach.

141. Plaintiff and Class Members had a legitimate expectation of privacy to their Private Information and were entitled to the protection of this information against disclosure to unauthorized third parties.

142. Defendants each owed a duty to Plaintiff and the proposed Class Members, whose Private Information it maintained, to keep their Private Information confidential.

143. The unauthorized release of Private Information is highly offensive to any reasonable person.

144. Plaintiff's and Class Members' Private Information is not of legitimate concern to the public.

145. Defendants knew or should have known that Plaintiff's and Class Members' Private Information was private.

146. Defendants publicized Plaintiff's and Class Members' Private Information, by communicating it to cybercriminals who had no legitimate interest in this Private Information and who had the express purpose of monetizing that information by injecting it into the illicit stream of commerce flowing through the dark web and other malicious channels of communication (e.g., Telegram and Signal).

147. It is therefore substantially certain that Plaintiff's and Class Members' Private Information is rapidly becoming public knowledge, among the community writ large, due to the nature of the cyberattack that procured it and the identity theft that it is designed for.

148. Moreover, because of the ubiquitous nature of data breaches, especially in the healthcare industry, Defendants was substantially certain that a failure to protect Private Information would lead to its disclosure to unauthorized third parties, including the thousands of waiting identity thieves who are in a special relationship to Plaintiff and the proposed Class Members, in that those identity thieves are precisely the individuals whose aim it is to misuse such Private Information.

149. Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that Defendants' inadequate data security measures will likely result in additional data breaches. Plaintiff and Class Members have no adequate remedy at law for

the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiff's and Class Members' privacy by Defendants.

**COUNT V**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On Behalf of Plaintiff and the Class)**

150. Plaintiff incorporates the above allegations as if fully set forth herein.

151. Defendants are each a "person" as defined by Cal. Bus. & Prof. Code § 17201.

152. Upon information and belief, Defendants are each headquartered in California, and their decisions regarding the collection, storage, and security of Plaintiff's and Class Members' Private Information were made in and emanated from California. California law therefore applies to the conduct alleged herein as to Plaintiff and all Class Members.

153. Defendants engaged in unlawful and unfair business acts and practices in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. (the "UCL").

154. Defendants' acts and practices were unlawful because they violated, among other things: (a) Section 5 of the FTC Act, 15 U.S.C. § 45; (b) HIPAA and its implementing regulations, including the Security Rule and the Breach Notification Rule; and (c) the Confidentiality of Medical Information Act, Cal. Civ. Code § 56, *et seq.* (the "CMIA"), as alleged below.

155. Defendants' acts and practices were unfair because Defendants failed to implement and maintain reasonable security measures to protect Plaintiff's and Class Members' Private Information and failed to timely identify and report the Data Breach. This conduct offends the established public policy reflected in the statutes identified above. It is immoral, unethical, oppressive, and unscrupulous. It also caused substantial injury to Plaintiff and Class Members that they could not reasonably avoid, because they had no ability to choose Defendants or to control its security practices. The harm caused by Defendants' conduct greatly outweighs any benefit to Defendants, consumers, or competition.

156. Defendants' conduct was also unfair because Defendants avoided the cost of implementing reasonable security measures while profiting from the processing of Plaintiff's and Class Members' Private Information.

157. As a direct and proximate result of Defendants' unlawful and unfair acts and practices, Plaintiff and Class Members suffered injury in fact and lost money or property. Their losses include the diminished value of their Private Information, which has recognized economic value. Upon information and belief, they also include the portion of payments made by or on behalf of Plaintiff and Class Members for their healthcare that was used to compensate Defendants for services that should have included reasonable protection of their Private Information.

158. Plaintiff and Class Members lack an adequate remedy at law. Damages cannot compel Defendants to implement reasonable security measures or secure the

Private Information that remains in Defendants' systems, and may not fully compensate Plaintiff and Class Members for future harms that are difficult to quantify. Equitable relief is also appropriate because the UCL's standards of liability differ from, and are broader than, those governing Plaintiff's legal claims.

159. Plaintiff and Class Members therefore seek all relief available under Cal. Bus. & Prof. Code § 17203, including restitution and injunctive relief requiring Defendants to implement and maintain reasonable data security measures, together with reasonable attorneys' fees under Cal. Code Civ. Proc. § 1021.5.

**COUNT VI**
**VIOLATION OF THE CONFIDENTIALITY OF MEDICAL INFORMATION ACT**
**Cal. Civ. Code § 56, *et seq.***
**(On Behalf of Plaintiff and the Class)**

160. Plaintiff incorporates the above allegations as if fully set forth herein.

161. Upon information and belief, Defendants are each deemed a "provider of health care" under Cal. Civ. Code § 56.06 because they are each a business organized, at least in part, for the purpose of maintaining medical information. As alleged above, Defendants built and maintained a centralized data warehouse combining Astrana's practice management and electronic medical record data, and they captured and maintained patient information on Astrana's behalf before patient visits and procedures.

162. Alternatively, Defendants received Plaintiff's and Class Members' medical information from providers of health care, including Astrana, to provide medical and other services. Under Cal. Civ. Code § 56.10(c)(3), information disclosed for those purposes

may not be further disclosed by the recipient in any way that would violate the CMIA.

163. Plaintiff and Class Members are "patients" within the meaning of Cal. Civ. Code § 56.05.

164. The Private Information compromised in the Data Breach constitutes "medical information" within the meaning of Cal. Civ. Code § 56.05. It is individually identifiable information, in electronic form, derived from providers of health care regarding Plaintiff's and Class Members' medical history, mental or physical condition, or treatment. It includes diagnosis, treatment, and health insurance information combined with names, addresses, and dates of birth.

165. Cal. Civ. Code § 56.101(a) requires every provider of health care that creates, maintains, preserves, or stores medical information to do so in a manner that preserves its confidentiality. Any provider that negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information is subject to the remedies and penalties provided under Cal. Civ. Code § 56.36(b) and (c).

166. Cal. Civ. Code § 56.36(b) permits an individual to bring an action against any person or entity that has negligently released confidential information or records concerning the individual in violation of the CMIA. The individual may recover nominal damages of $1,000, which do not require proof of actual damages, as well as the amount of actual damages sustained.

167. Defendants violated the CMIA in two ways. First, they negligently created, maintained, preserved, and stored Plaintiff's and Class Members' medical information in

a manner that failed to preserve its confidentiality. Second, they negligently released that information by failing to implement reasonable security measures, resulting in the Data Breach, and allowing which allowed cybercriminals to access and exfiltrate it without authorization.

168. Upon information and belief, unauthorized persons actually viewed and accessed Plaintiff's and Class Members' medical information. Cybercriminals exfiltrated the data.

169. Defendants' disclosure of Plaintiff's and Class Members' medical information to unauthorized third parties was not authorized by Plaintiff or Class Members and was not permitted by any exception under the CMIA.

170. As a direct and proximate result of Defendants' violations of the CMIA, Plaintiff and Class Members have suffered the injuries alleged herein, including the loss of privacy and confidentiality of their medical information.

171. Plaintiff and Class Members are therefore entitled to the following relief:

- nominal damages of $1,000 per Class Member under Cal. Civ. Code § 56.36(b)(1);
- actual damages under Cal. Civ. Code § 56.36(b)(2);
- compensatory damages, punitive damages, and attorneys' fees and costs under Cal. Civ. Code § 56.35; and
- such other relief as the Court deems proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Wanda Gaither, individually and on behalf of all others similarly situated, requests judgment against Defendants and that the Court grant the following:

A. For an Order certifying this action as a class action and appointing Plaintiff and her counsel to represent the Class;

B. For an award of actual damages, compensatory damages, statutory damages, and nominal damages, including nominal damages of $1,000 per Class Member under Cal. Civ. Code § 56.36(b), and restitution under Cal. Bus. & Prof. Code § 17203, in an amount to be determined, and for punitive damages, as allowable by law;

C. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

D. For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendants to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. requiring Defendants to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendants can provide to the Court reasonable justification for the

retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiff and Class Members;

v. requiring Defendants to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

vi. requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

vii. requiring Defendants to audit, test, and train its security personnel regarding any new or modified procedures; requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other portions of Defendants' systems;

viii. requiring Defendants to conduct regular database scanning and securing checks;

ix. requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as

protecting the personal identifying information of Plaintiff and Class Members;

x. requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xi. requiring Defendants to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personal identifying information;

xii. requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiii. requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and

xiv. for a period of 7 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

E. For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

F. Pre- and post-judgment interest on any amounts awarded; and

G. Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 13, 2026

Respectfully submitted,

*/s/ Gregory Haroutunian*

M. Anderson Berry (SBN 262879)
Gregory Haroutunian (SBN 330263)
**EMERY | REDDY, PC**
333 University Avenue, Suite 200
Sacramento, CA 95825
916.823.6955 (Tel)
206.441.9711 (Fax)
*anderson@emeryreddy.com*
*gregory@emeryreddy.com*

Grayson Wells (TN BPR # 039658)*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
*gwells@stranchlaw.com*

***Counsel for Plaintiff and the Proposed Class***

**Pro Hac Vice Application Forthcoming*